IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE TONOPAH SOLAR ENERGY, LLC,   ) <br><br> Reorganized Debtor.   ) | Chapter 11 <br> Case No. 20-11844 (KBO) |
| CMB EXPORT, LLC, *et al.*,   ) <br><br> Appellants,   ) <br><br> v.   ) <br><br> TONOPAH SOLAR ENERGY, LLC,   ) <br><br> Appellee.   ) | C.A. No. 20-1749 (MN) |

## <u>MEMORANDUM OPINION</u>

Vincent F. Alexander, LEWIS BRISBOIS BISGAARD & SMITH LLP, Fort Lauderdale, FL; Andrew Bluth, LEWIS BRISBOIS BISGAARD & SMITH LLP, Sacramento, CA; Francis G.X. Pileggi, Cheneise V. Wright, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, DE – Counsel to Appellants.

Paul V. Shalhoub, Todd G. Cosenza, Charles D. Cording, Ciara A. Copell, WILLKIE FARR & GALLAGHER LLP, New York, NY; Edmon L. Morton, Matthew B. Lunn, Ashley E. Jacobs, Jared W. Kochenash, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Counsel to Appellee.

March 31, 2022
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is an appeal by CMB Export, LLC ("CMB Export"), CMB Infrastructure Investment Group IX, LP ("CMB Group IX," and together with CMB Export, "CMB"), and SolarReserve CSP Holdings, LLC ("SolarReserve," and collectively with CMB, "Appellants") from the Bankruptcy Court's December 9, 2020 *Findings of Fact, Conclusions of Law and Order Confirming Chapter 11 Plan for Tonopah Solar Energy, LLC* (B.D.I. 291; MTD0933-1089)[1] ("Confirmation Order"). Appellants are holders of general unsecured litigation claims against the debtor Tonopah Solar Energy, LLC ("Tonopah" or "Debtor") which claims are unimpaired under the terms of the confirmed plan. Seeking to reverse the Confirmation Order, and presumably overturn the plan *in toto*, Appellants raise five issues on appeal. (*See* D.I. 19 at 2). Tonopah has moved to dismiss the appeal on the basis that the appeal is equitably moot (*see* D.I. 16 at 15-24) ("Motion to Dismiss"), or, in the alternative, if the appeal is not dismissed, Tonopah moves to strike two issues designated by Appellants on the basis that Appellants lack appellate standing to raise them (*see id*. at 24-27) ("Motion to Strike"). For the reasons set forth herein, the Court will grant the Motion to Strike, affirm the Confirmation Order, and deny the Motion to Dismiss as moot.

## I.     BACKGROUND

### A.     The Debtor

Tonopah owns and operates a net 110-megawatt concentrated solar energy power plant ("Plant") located near Tonopah in Nye County, Nevada. (*See* MTD0202-0368 ("Disclosure Statement") at MTD0218). The Plant, also known as the Crescent Dunes Solar Energy Project

---

[1]     The docket of the chapter 11 cases, captioned *In re Tonopah Solar Energy, LLC*, Case No. 20-11884 (KBO) (Bankr. D. Del.), is cited herein as "B.D.I. __." The appendix (D.I. 18) filed in support of the Debtor's Motion to Dismiss (D.I. 16) is cited herein as "MTD__." The appendix (D.I. 21) filed in support of Debtor's answering brief on the merits (D.I. 20) is cited herein as "A__."

("Project"), was to be the first utility-scale solar project of its kind in the U.S. to store energy as heat in the form of molten salt, effectively functioning as a giant battery with the capability to generate electricity at night. (*Id.*). The development of the Project depended on identifying a construction company that would assume the risks associated with the required engineering, procurement, and construction contract. (MTD0219). In December 2009, Tonopah executed a contract (as amended, "EPC Contract") with Cobra Thermosolar Plants, Inc. ("CPI") to provide engineering, procurement, and construction services in connection with the Project. (*Id.*). As the result of certain amendments to the EPC Contract, CPI was required to maintain standby letters of credit ("EPC Letters of Credit") that Tonopah could draw upon to the extent certain operating and other expenses were not paid by CPI in accordance with the terms of the EPC Contract. (D.I. 17 ("Pugh Appeal Decl.") ¶ 7(viii)).

The Project was funded through equity investments from an affiliate of SolarReserve, Cobra Energy Investments, LLC ("CEI"), which is an affiliate of ACS Servicios Comunicaciones y Energía S.L. ("ACS" and, together with CEI and CPI, "Cobra"), and Banco Santander, S.A. ("Banco Santander"). (MTD0219). In addition, Tonopah and the U.S. Department of Energy ("DOE") entered into a Loan Guarantee Agreement, dated September 23, 2011 ("LGA"), whereby the DOE guaranteed a project loan made to Tonopah by the Federal Financing Bank ("DOE Loan"). (*Id.*). In connection with its obligations under the LGA, SolarReserve obtained $90 million in financing from CMB Group IX, which loan was memorialized in the "Group IX Loan Agreement." (MTD0071). Tonopah is not a party to the CMB Group IX Loan Agreement. (*Id.*).

The DOE Loan was secured by substantially all of Tonopah's assets, including the Project, Tonopah's rights under its major contracts (including the EPC Contract), and all cash maintained in the DOE-controlled accounts. (MTD0224). PNC Bank, National Association d/b/a Midland Loan Services served as collateral agent ("Prepetition Collateral Agent") in connection with the PPA (defined below) (MTD0220). As of the petition date, the approximate principal amount of the DOE

Loan was $425 million, and the accrued and unpaid interest under the DOE Loan was approximately $7.4 million.  (MTD0224).

As of the petition date, all of the equity interests in Tonopah were owned by nondebtor Tonopah Solar Energy Holdings II, LLC ("TSEH II").  (MTD0226).  The equity interests in TSEH II were divided into two classes: Class A Units held solely by Capital One as a tax equity investor and Class B Units owned by non-debtor Tonopah Solar Energy Holdings I, LLC ("TSEH I").  (*Id.*).  TSEH I was owned indirectly by Banco Santander (26.8%) and directly by non-debtor Tonopah Solar Investments, LLC (73.2%) ("TSI LLC").  (*Id.*).  CEI and SolarReserve each held 50% of TSI LLC.  (*Id.*).  Therefore, both CEI and SolarReserve were thrice removed remote, indirect owners of Tonopah, but neither was the holder of an equity interest directly in Tonopah.

Neither of the Appellants are equity holders of Tonopah.  SolarReserve's equity ownership is positioned several layers up Tonopah's organizational chain – SolarReserve is an equity holder of TSI LLC, which is an equity holder of TSEH I.  (MTD0224).  TSEH I, in turn, is an equity holder of TSEH II, Tonopah's parent company.  (*Id.*).  CMB is a lender to SolarReserve, not Tonopah, and has received an assignment of certain claims asserted by SolarReserve.  (*See* MTD0049-54, 97).

### B.    Events Leading to Chapter 11 Filing

Tonopah commenced commercial operations and production at the Plant in November 2015.  (MTD0220).  The electricity generated by the Plant was sold exclusively to the Nevada Power Company, d/b/a NV Energy ("NVE") under a long-term power purchase agreement ("PPA").  (MTD0218).  In late March 2019, the Plant's hot salt tank – an essential component in the operation of the Plant – experienced a leak, which required Tonopah to halt all power generating operations at the Plant in early April 2019.  (MTD0222).  Although CPI commenced repairs to the tank, the Plant was unable to produce any electricity beginning in April 2019, also ending Tonopah's ability to generate revenue through the sale of power.  (*Id.*).  In September 2019, DOE sent Tonopah a

Notice of Events of Default alleging that Tonopah was in default under several provisions of the LGA. (*Id.*). NVE terminated the PPA in October 2019. (MTD0226). In early 2020, facing liquidity issues, Tonopah, Cobra, and the DOE began discussions regarding the compromise and settlement of the DOE's claims for an agreed-upon reduced amount. (MTD0227). Ultimately, following months of extensive arm's length negotiations, Tonopah, Cobra, and DOE agreed in principle to the terms of a de-leveraging transaction through a pre-negotiated chapter 11 plan that also involved the settlement of an arbitration proceeding commenced under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce in which CSI and Tonopah asserted substantial claims against each other relating to the EPC Contract ("ICC Arbitration"). (*Id.*).

On July 29, 2020, Tonopah and Cobra entered into a Restructuring Support Agreement ("RSA"), which provided that: (a) DOE would receive, in full and complete satisfaction of Tonopah's outstanding obligations under the Loan Documents (as defined in the LGA), a payment of $200 million in cash upon the effective date of the Plan, plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding Tonopah's obligations under the Plan through new debt financing and cash to be provided on the effective date of the Plan; (b) the security interests granted under the Security Documents (as defined in the LGA) would be released; (c) the parties would enter into mutual, consensual releases of all claims against each other on the terms set forth in the Plan; (d) Cobra or an affiliate thereof would own 100% of Tonopah upon completion of the restructuring; and (e) all other claims would remain unimpaired as set forth in the Plan. (*Id.*).

## C.    Chapter 11 Case

On July 30, 2020 ("Petition Date"), Tonopah commenced a voluntary case under chapter 11 the Bankruptcy Code. The same day, Tonopah filed a proposed plan (MTD0145-201) (as amended "Plan"), which embodied the terms of the RSA, along with a related disclosure statement

(MTD0202-368).   Despite their tenuous connection to Tonopah, Appellants filed objections to various requests for relief filed by Tonopah, including to Tonopah's consensual use of cash collateral and approval of its Disclosure Statement (both of which were overruled by the Bankruptcy Court), and also served multiple and voluminous discovery requests on Tonopah.  (*See* B.D.I. 85 & 133).   Appellants' standing to participate in the chapter 11 case was challenged by Tonopah and questioned by the Bankruptcy Court throughout the bankruptcy proceedings.   (*See, e.g.*, MTD00013-36) ("8/24/20 Tr.") at 20:3-7 ("Solar Reserve's . . . standing . . . to be heard in connection with this matter seems to be questionable at best[.]"); MTD0369-0412 ("9/4/20 Tr.") at 39:3-5 ("[Appellants] don't have standing to object to the disclosure statement in their capacity as a remote investor and non-voting party[.].").

Despite the fact that no bar date was set for proofs of claim – as all creditors with the exception of DOE were unimpaired under the proposed plan – Appellants still filed proofs of claim in the chapter 11 case.   According to Tonopah, Appellants filed these proofs of claims to "manufacture standing."  (D.I. 16 at 23).  CMB's proofs of claim asserted a general unsecured claim against Tonopah in the amount of $90 million based upon a complaint (as amended, "Nevada Complaint") filed months before Tonopah's chapter 11 filing on May 19, 2020 in Nevada state court against Cobra, certain Cobra affiliates, and Tonopah, among others ("Nevada Action").   (*See* MTD0224-25).   The amended Nevada Complaint filed on September 1, 2020 (MTD0058-94) focuses on claims against Cobra and alleges that the Project was "plagued by repeated failures by [CPI]" and that "[t]he Project's failure is due almost entirely to [Cobra]."  (MTD0059-60).  For its part, SolarReserve's proof of claim asserted a general unsecured claim against Tonopah asserting unliquidated monetary damages based upon a nonmonetary action filed by SolarReserve against Tonopah in the Delaware Court of Chancery on February 5, 2020, seeking to enforce its alleged contractual right to inspect Tonopah's books and records.  (MTD0422-29).  Prior to Tonopah's

bankruptcy filing, however, after a one-day bench trial, the Court of Chancery resolved the action in Tonopah's favor, holding that SolarReserve could not enforce its purported inspection rights because (a) it had assigned all claims it had against Tonopah to CMB, and (b) Tonopah's operating agreement expressly denied information rights to "unaffiliated successors" such as CMB. *SolarReserve CSP Holdings, LLC v. Tonopah Solar Energy, LLC*, 2020 WL 4251968, at \*5-6 (Del. Ch. July 24, 2020). The decision was on appeal at time of the confirmation hearing.[2]

On October 1, 2020, Tonopah filed its objection to Appellants' proofs of claim (MTD0430-519) ("Claim Objection") seeking entry of an order (a) determining that CMB and SolarReserve lacked standing in the chapter 11 case and (b) disallowing the proofs of claim for lack of standing and failure to state a claim against Tonopah. The Bankruptcy Court held a hearing on the Claim Objection (MTD0520-0542) ("10/27/20 Tr."), at which time Appellants argued that they possessed standing "to participate in all aspects" of the chapter 11 case. (*Id*. at 6:1). The Bankruptcy Court noted that neither CMB nor SolarReserve held a direct interest in Tonopah and that, as a result, "they are too far removed to participate in this case as parties in interest based on that ownership thrice removed or even more removed." (*Id*. at 8:24-9:4). Bankruptcy judge, the Honorable Karen B. Owens, noted that Appellants lacked Article III standing to object to portions of the Plan that did not affect their direct interest, such as the release provisions, valuation, and satisfaction of the absolute priority rule, because they were "unimpaired under the plan[.]" (*Id*. at 8:24-10:5). The Bankruptcy Court went on to emphasize that Appellants' standing was extremely limited and that, as a result, any Plan objections must be limited:

---

[2]     The Delaware Supreme Court later dismissed the appeal as moot. *SolarReserve CSP Holdings, LLC v. Tonopah Solar Energy, LLC*, 258 A.3d 806 (Del. Aug. 9, 2021). As the chapter 11 proceeding resulted in Tonopah's reorganization, along with a new LLC Agreement that eliminated the inspection provision at issue, the parties agreed that the relief in the underlying books and records action could not be granted. *Id*. at \*1.

> So based on their unimpaired status no matter what their general unsecured claims are, there is no injury under this plan to Appellants as claimholders that I can address based on the absolute priority rule or valuation argument. . . . I can't envision many other meaningful objections that Appellants can raise to the plan. But if those objections are raised, I think that they're going to be extremely limited.

(*Id.* at 10:1-22; *see also id.* 20:19-21, 22:20-23 (permitting "limited discovery" concerning feasibility but not valuation)).

###    D.    Plan Confirmation

On November 6, 2020, Appellants filed an objection to plan confirmation (MTD0543-564) ("Confirmation Objection") which argued that: (i) the Plan did not meet the feasibility requirement of § 1129(a)(11) of the Bankruptcy Code; (ii) notwithstanding the express terms of the Plan, unsecured creditors were impaired under the Plan and therefore entitled to vote; (iii) the Plan was not proposed in good faith as required by § 1129(a)(3) of the Bankruptcy Code; (iv) the Plan did not satisfy § 1129(a)(7)'s best interests test as creditors would fare better under a liquidation of Tonopah; (v) the Plan releases and exculpation were overbroad; and (vi) Tonopah failed to identify contracts it sought to assume.  Given the court's prior ruling, a dispute arose regarding the scope of expert witness testimony.  (MTD0565-0612 ("11/16/20 Tr.") at 3:8-17).  Based on their status as unimpaired, unsecured creditors, Tonopah argued that Appellants lacked standing to challenge the reasonableness of the settlement embodied in the Plan, as well as whether the Plan satisfied the best interests of creditors test, was proposed in good faith, and included releases that were overbroad, as those aspects of the Plan did not impact Appellants' treatment and ultimate recovery and/or were not applicable to the Plan based upon the class structure thereof.  (*Id.* at 9:20-12:11).  Tonopah therefore requested that the Bankruptcy Court limit the scope of Appellants' expert testimony to plan feasibility.  (*Id.* at 12:12-21).  The Bankruptcy Court agreed with Tonopah, ruling that Appellants' expert testimony must be limited to feasibility and that Appellants needed to "be careful

that [such testimony] did not stray into other topics . . . such as challenges to the releases" given that

Appellants were not impaired under the Plan:

> "[T]he idea that you're impaired, I'm just going to tell you right now, you're not impaired under the plan. The plan says that your claim is just flowing through. So, to me, your objection is whether the plan is going to be able to satisfy your claim if it is ultimately allowed . . . So, that's a feasibility objection; that's not an impairment objection.

(*Id.* at 18:5-11; *see also* 37:4-25; 38:1-7).

On November 20, 2020 (MTD0613-0832) ("11/20/20 Tr.") and December 3, 2020 (MTD0833-0932) ("12/3/20 Tr."), the Bankruptcy Court held a two-day hearing ("Confirmation Hearing"). Tonopah and Appellants presented testimony regarding plan feasibility. In addition, as the result of mediation sessions conducted by the Honorable Brendan L. Shannon at Judge Owens' suggestion, Tonopah and Cobra presented enhancements to the Plan made for the benefit of Appellants: Cobra agreed to (i) provide a $6 million irrevocable letter of credit ("CMB/SR Letter of Credit") in favor of Appellants as a reserve to be drawn on in the event that Appellants obtain a final, non-appealable judgment against Tonopah and Tonopah fails to pay that judgment, and (ii) increase the Working Capital Facility (defined below) by $14 million. (*See* 12/3/20 Tr. at 6:18-25; 7:1-21). The Bankruptcy Court ruled that the record supported a finding that the Plan was feasible, particularly in light of the CMB/SR Letter of Credit and increase to the Working Capital Facility, and the Plan satisfied each of the Bankruptcy Code's confirmation standards. (*See id.* at 93:9-15). The Bankruptcy Court entered the Confirmation Order on December 9, 2020. On December 18, 2020, the Plan became effective and Tonopah emerged from chapter 11. (MTD1090-92).

On December 23, 2020, Appellants filed a timely notice of appeal of the Confirmation Order. (D.I. 1).  On April 12, 2021, Debtor filed its Motion to Dismiss and Strike, which has been fully briefed.  (D.I. 15-18, 23, 26-28).  The merits of the appeal are fully briefed.  (D.I. 19, 20, 25).

## II.     <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). The Confirmation Order is a final, appealable order.  The Bankruptcy Court's legal conclusions are reviewed *de novo*, its factual findings for clear error, and its exercises of discretion for abuse.  *See In re Michael*, 699 F.3d 305, 308 n.2 (3d Cir. 2012).  The parties agree that this Court reviews the Bankruptcy Court's feasibility finding for clear error.  *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x. 188, 193 (3d Cir. 2014).  The District Court shall not reverse a feasibility finding unless the Bankruptcy Court's factual findings are "completely devoid of a credible evidentiary basis or bear[ ] no rational relationship to the supporting data[.]"  *Id.* (quoting *Shire U.S., Inc. v. Bar Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003)).  Finally, the Court reviews evidentiary rulings for abuse of discretion.  *See U.S. v. Console*, 13 F.3d 641, 656 (3d Cir. 1993); *see also In re Trans World Airlines*, 1996 WL 756962, at *2 (D. Del. Dec. 31, 1996) ("As decisions by a bankruptcy court regarding the scope of evidence to be considered and the management of discovery are discretionary, such decisions can only be overruled if they constitute an abuse of discretion.").  Even if the Bankruptcy Court erred by admitting evidence, the appellant must demonstrate that admitting such evidence was prejudicial to warrant reversal.  *See* Fed. R. Civ. P. 61; Fed. R. Bankr. P. 9005.

## III.     <u>PARTIES' CONTENTIONS</u>

Appellants argue that the bankruptcy court erred in (1) finding that the Plan is feasible as required by § 1129(a)(11); (2) permitting the hearsay testimony of Justin Pugh regarding Plan feasibility; (3) permitting the testimony of Justin Pugh regarding Plan feasibility when Mr. Pugh

was not qualified as an expert witness; (4) finding that the Debtor satisfied its evidentiary burden of proof for confirmation of the Plan under §§ 1129 (a) and (b); and (5) in finding that the Plan was proposed in good faith as required by 11 U.S.C. § 1129(a)(3).

Appellants contend that they are "significant creditors and indirect equity holders of Debtor" who were left out of Debtor's plan negotiations and will be impaired under the Plan.  (D.I. 19 at 9). According to Appellants, Cobra is the "the primary party responsible for Debtor's failures," and yet, through the Plan, which represents a "collusive effort between "Cobra, Debtor, DOE, and others," Cobra will not only be "gifted a 100% interest in reorganized Debtor," Cobra will also receive a release, through the Plan's "overbroad and impermissible releases," from "enormous liabilities associated with [Cobra's] bad faith, willful misconduct, and gross negligence in constructing the Power Plant" including estate claims "worth more than $1 billion."  (*Id*. at 9-10).

Appellants further assert that, contrary to Debtor's assertions, the Plan will impair their claims.  (*Id*. at 10).  "[U]nder the Plan, the Debtor will not have sufficient reserves to pay Appellants' claims in excess of $90 million once Appellants prevail on such claims," as the Debtor's "financial projections conclusively establish Debtor's inability to pay such claims."  (*Id*. at 13).  According to Appellants, the court's finding that the Plan is feasible is unsupported by credible and admissible evidence, including that: (a) there will be sufficient funds to pay creditors in full; (b) the Plant repairs will be successful; (c) Debtor has sufficient working capital facility to operate for approximately 3 years even if operations never resume; and (d) it is unreasonable for feasibility purposes to assume Appellants have a $90 million claim against Debtor.  (*Id*. at 10-24).  Appellants further assert that the Debtor did not propose the plan in good faith.  (*Id*. at 12-13; 25-26).

Debtor contends this appeal is simply another tactic in Appellants' litigation campaign stemming from Appellants' dissatisfaction with Cobra, SolarReserve's joint venture partner, and the value of SolarReserve's remote and indirect investment in Tonopah.  (D.I. 16 at 3).  The Plan

does not impair Appellants' rights in any manner, Debtor argues: "At most, Appellants hold contingent, unliquidated general unsecured claims against Tonopah, based on highly disputed and speculative litigation claims, which are unimpaired under the Plan in any case." (*Id.*).

Debtor argues that the appeal should be dismissed as equitably moot. According to Debtor, the RSA and Plan followed months of extensive negotiations among Tonopah, DOE, the DOJ, and Cobra, and reflects a comprehensive settlement of complex claims and litigation, including DOE's claims under the $432 million DOE Loan as well as costly litigation between Tonopah and Cobra which would have continued for years. Appellants failed to seek a stay of the Confirmation Order, and the Plan has been substantially consummated. Among the many interrelated transactions contemplated by the Plan: Tonopah has consummated significant exit financing facilities, made Plan distributions, and engaged vendors to repair the Plant; the $432 million in secured debt owed to DOE has been satisfied by a $200 million cash payment funded by Cobra and through a new $100 million contingent note issued by Tonopah and guaranteed by Cobra; DOE has released its liens and security interests against the Plant; the consensual releases set forth in the Plan have been granted, and the ICC Arbitration has been dismissed with prejudice. (*Id.* at 15-18). The appeal threatens to fatally scramble the Plan, and Appellants suggest no remedy separate from reversing the Confirmation Order in its entirety. (*Id.* at 18-22). In such an event, the comprehensive restructuring would be undone, Debtor asserts, and Tonopah could be forced to liquidate through chapter 7, in which case recoveries to all creditors would be significantly reduced. Under these circumstances, Debtor argues, it is clear that the appeal is equitably moot and should be dismissed.

Should the Court reach the merits of the appeal, Debtor asserts, the first three issues identified by Appellants center on the narrow question of whether the Bankruptcy Court committed clear error in determining that the Plan was feasible. Contrary to Appellants' premise – that the Bankruptcy Court's feasibility determination depended exclusively on the testimony of Tonopah

witness Justin Pugh, whom they term "a single, one-stop-shop for all testimony supporting feasibility (*see* D.I. 19 at 12) – Debtor asserts that the record supporting the Bankruptcy Court's feasibility finding is overwhelming, and the Confirmation Order should be affirmed.  With respect to the remaining issues on appeal, Debtor asserts that Appellants do not have standing to raise "Issue 4" (whether the court erred in finding that Tonopah satisfied its burden of proof for confirmation of the Plan under §§ 1129(a) and (b) of the Bankruptcy Code), or "Issue 5" (whether the court erred in finding that the Plan was proposed in good faith as required by § 1129(a)(3) of the Bankruptcy Code).  Accordingly, the Debtor asks this Court to strike those issues.  (D.I. 16 at 24-28).

## IV.    MOTION TO STRIKE (ISSUES 4 & 5)

Appellants assert that the Bankruptcy Court erred in finding that the Debtor satisfied its evidentiary burden of proof for confirmation of the Plan under §§ 1129 (a) and (b) (Issue 4) and specifically that the Bankruptcy Court erred in finding that Plan was proposed in good faith under § 1129(a)(3) (Issue 5).  Debtor argues that, with the exception of plan feasibility, Appellants lacked appellate standing to appeal these issues.  The Court agrees with the Debtor.

### A.    Plan Confirmation Requirements

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case." 7 Collier on Bankruptcy ¶1129.01 (16th ed. 2020).   Before confirming a plan, a court must determine (subject to one notable exception explained below) that "all . . . of the requirements" of § 1129(a) of the Bankruptcy Code are satisfied.  *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 243 n.59 (3d Cir. 2004).  Section 1129(a) contains many requirements, but only a few are relevant to this appeal.  First, § 1129(a)(3) requires the court to determine that "[t]he plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Section 1129(a)(7) requires that ("With respect to each ***impaired*** class of claims or interests, each holder of a claim . . . has accepted the plan; or will receive or retain under the plan on account of such claim or interest

property of a value . . . that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code.]")  11 U.S.C. § 1129(a)(7) (emphasis added).  Section 1129(a)(11) requires the court to determine that the plan is feasible – i.e., "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . ." 11 U.S.C. § 1129(a)(11).  Finally, the Bankruptcy Code authorizes a departure from strict adherence to these requirements in one circumstance, which is codified in § 1129(b) – often referred to as the "cramdown" provision.  *See RadLAX Gateway Hotel, LLC*, 566 U.S. 639, 641-42 (2012).  That provision states that, so long as all § 1129(a) requirements are satisfied except for § 1129(a)(8) – which requires the court to determine that each creditor class has either accepted the plan or is otherwise unimpaired by the plan – then the court may still confirm a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is *impaired* under, and has not accepted, the plan." 11 U.S.C. § 1129(b) (emphasis added).

### B.    Appellate Standing

"Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court."  *Combustion Eng'g, Inc.*, 391 F.3d at 214.  The "person aggrieved" standard is a prudential standing doctrine limiting bankruptcy appeals to those "whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court." *Id.*[3]  A party suffers harm from a bankruptcy court order that is redressable on appeal "only if the bankruptcy court's order 'diminishes their property, increases their burdens, or impairs their

---

[3]    The restrictive approach to bankruptcy appellate standing contrasts with the broad right of participation in the early stages of a bankruptcy proceeding.  Under § 1128(b) of the Bankruptcy Code, any "party in interest" may object to plan confirmation during the confirmation hearing.   11 U.S.C. 1128(b).   "This more stringent appellate standing requirement rests on the 'particularly acute' need to limit appeals in bankruptcy proceedings, which often involve a 'myriad of parties . . . indirectly affected by every bankruptcy court order[.]'"  *Combustion Eng'g*, 391 F.3d at 215 (quoting *Travelers Ins. Co. v. H.K. Porter Co., Inc.*, 45 F.3d 737, 741 (3d Cir. 1995)).

rights.'"  *Id.*  Appellate standing in the context of bankruptcy "is more restrictive than Article III standing" and "must be based strictly on financial injury."  *In re Revstone Indus. LLC*, 690 F. App'x 88, 89 (3d Cir. 2017).  The Third Circuit has further noted that "[s]tanding is not dispensed in gross, but rather is determined by the specific claims presented."  *Combustion Eng'g*, 391 F.3d at 215.

Courts have limited unimpaired creditors' standing to those issues directly affecting their interests and barred such creditors from challenging confirmation on other grounds.  *See id.* at 217 & 219 n.28 (limiting certain insurers' appellate standing to challenge only one plan provision regarding insurance neutrality); *In re G-I Holdings Inc.*, 420 B.R. 216, 255 (D.N.J. 2009) ("As an unimpaired creditor, the provisions of the plan relating to § 1129(b) have no effect on the interests of the IRS."); *In re A.P.I., Inc.*, 331 B.R. 828, 857 n.48 (Bankr. D. Minn. 2005), *aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, 2006 WL 1473004 (D. Minn. May 25, 2006) ("[The Bankruptcy Code] generally denies standing to object to confirmation when a plan does not impair a particular creditor's claim.").

### C.    Appellants Lack Appellate Standing to Raise Issues 4 & 5

The Plan left all creditors, other than DOE, unimpaired, and provided that all general unsecured claims, like Appellants' contingent litigation claims, would ride through to the reorganized entity.  Appellants have appellate standing to appeal the Confirmation Order only to the extent that their "rights or interests are directly and adversely affected pecuniarily" by the Confirmation Order – i.e., whether the Plan contains sufficient funding to satisfy Appellants' claims if they are ultimately successful in the Nevada Action.  The question of whether the Plan contains sufficient funding is an issue of feasibility, and the only confirmation standard properly before this Court on appeal is feasibility.  (*See* 11/16/20 Tr. at 18:5-11).

Appellants do not have standing to appeal the Bankruptcy Court's finding that the Plan satisfied the best interests of creditors test under § 1129(a)(7) of the Bankruptcy Code because, by

its terms, this provision applies only to ***impaired*** creditors. 11 U.S.C. § 1129(a)(7) ("With respect to each ***impaired*** class of claims or interests, each holder of a claim . . . has accepted the plan; or will receive or retain under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code.]") (emphasis added).  Section 1129(b) similarly applies only in the context of a "cramdown" of a plan over the objection of an impaired class of creditors or equity holders.  *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 276 (Bankr. D. Del. 2016) ("[T]he Bankruptcy Code allows a plan proponent to 'cram down' the plan on non-accepting ***impaired*** classes under § 1129(b)(1)[.]") (emphasis added).  Nor do Appellants possess standing to question the good faith of the Plan, the release and exculpation provisions, or the appropriateness of settlements embodied in the Plan.  Even assuming a better settlement could be reached by Tonopah, DOE, and Cobra, any enhancement from such settlement would not inure to the benefit of unimpaired general unsecured creditors, who are already recovering 100% on account of their claims.  The only creditor with a stake in these issues is the DOE, who voted in favor of the Plan, even though it may recover as little as 47% on account of its secured claims against Tonopah. (MTD0214).  Appellants likewise are not impaired by the Plan's consensual third-party release given that they did not opt into this release.

Appellants fail to establish that their pecuniary interests are adversely affected by the Bankruptcy Court's determination that the Plan satisfied §§ 1129(a) and (b) of the Bankruptcy Code, other than arguably with respect to the limited issue of Plan feasibility addressed below. Accordingly, the Motion to Strike Issues 4 & 5 will be granted.

## V.    PLAN FEASIBILITY FINDING (ISSUES 1-3)

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation or further financial reorganization of the debtor (or any

successor thereto).  11 U.S.C. § 1129(a)(11).  This "feasibility" standard requires that "the Plan is workable and has a reasonable likelihood of success."  *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).  A guarantee of success is not required.  *Id.*; *see also In re W.R. Grace & Co.*, 729 F.3d 332, 349 (3d Cir. 2013) ("[Debtor] needed only to demonstrate a reasonable likelihood of success, not an absolute certainty."); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").  The debtor must establish this feasibility by a preponderance of the evidence.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (Bankr. D. Del. 2006).

### A.    Evidence and Compromises Supporting Plan Feasibility

Appellants contend that "the Bankruptcy Court's findings are unsupported by any credible and admissible evidence."  (D.I. 19 at 10).  The record reflects that, in support of plan confirmation, Tonopah filed a comprehensive brief (A0751-0819) ("Confirmation Brief"), which also responded to Appellants' Confirmation Objection.  Tonopah further filed the Declaration of Justin Pugh (A0820-0845) ("Pugh Decl."), a Managing Director of FTI Consulting, Inc. ("FTI"), who served as Tonopah's Treasurer since December 4, 2017.  (Pugh Decl. ¶ 1).  Because Tonopah's LLC Agreement prevented it from directly employing personnel, it had no employees of its own; Tonopah was entirely managed by FTI, whose actions were overseen and directed by Tonopah's Board of Managers, and obtained operational support from third-party contractors.  (A0276).  As a result, Mr. Pugh was intimately involved in all aspects of Tonopah's operations, business affairs, and financial condition.  (Pugh Decl. ¶¶ 1-6).  Tonopah also filed the Expert Valuation Report of Daniel B. Beaulne (A0648-0750) ("Beaulne Report"), setting forth an expert opinion of a Houlihan Lokey financial advisor regarding the fair market value of the Project.

On November 19, 2020, Appellants filed two expert declarations: (1) the Declaration of Todd Schatzki, Ph.D. (A0846-0902) ("Schatzki Decl."), which offered an opinion on the reliability of Tonopah's financial projections for the years 2021 to 2025, as provided in Amended Disclosure Statement (A0398) ("Financial Projections"), and the going-forward economic viability of the Project; and (2) the Declaration of Joseph Jaskulski (A0903-0935) ("Jaskulski Decl."), which opined on CPI's performance "and the impact of that performance on the future performance of the Crescent Dunes Thermosolar Power Plant."  Hours before the Confirmation Hearing, Appellants also filed a limited objection to paragraphs 38-40 and 42-44 of the Pugh Declaration, which were the portions of the Pugh Declaration that addressed feasibility (A0938-0947) ("Pugh Objection").

On November 20, 2020 the Bankruptcy Court commenced the two-day Confirmation Hearing, at which it received witness testimony and documentary evidence concerning confirmation of the Plan.  Prior to the Confirmation Hearing, the parties and the Bankruptcy Court contemplated that witnesses would provide direct testimony through previously submitted declarations and then be subject to cross examination; however, given the Pugh Objection, the Bankruptcy Court sought a direct examination of Mr. Pugh.  (*Id.* at 18:08-19:09).  The Bankruptcy Court entered those portions of the Pugh Declaration into evidence that were not subject to the Pugh Objection, and instructed that it would enter the paragraphs subject to the Pugh Objection only if Tonopah's counsel laid a foundation for the testimony through direct examination.  (11/20/20 Tr. at 18:7-15).  In particular, the Bankruptcy Court noted that Mr. Pugh was a "lay witness" under Federal Rule of Evidence 701, thus "his opinion needs to be rationally based on his perception."  (*Id.* at 18:7-15).

After Mr. Pugh provided sufficient foundation for the lay opinions provided in the Pugh Declaration, the Bankruptcy Court allowed his testimony on nearly all of the topics that were subject to the Pugh Objection.  (*See id.* at 29:7-13, 42:25-43:1 (allowing testimony concerning "when [Mr. Pugh] thinks the plant will be operational" and hot salt tank repair timeline and tasks, as

described in paragraph 38 of the Pugh Declaration); *id*. at 36:5-38:4, 43:9-48:3 (allowing testimony concerning recent discussions with NVE about its willingness to pay Tonopah $70/MWh for electricity and NVE's view of the Plant as similar to geothermal generators, as described in paragraph 39 of the Pugh Declaration); *id*. at 29:7-36:3 (allowing testimony concerning assumption that the Plant will be able to continuously generate 400 GWh, as described in paragraph 40 of the Pugh Declaration); *id*. at 48:8-50:7 (discussing Tonopah's post-emergence capital structure, including its $100 million in equity, $100 million in debt, approximately $63 million cash on hand, and $50 million working capital facility, which was later increased, as described in paragraphs 42-44 of the Pugh Declaration)).   The court also denied hearsay objections to explanations Mr. Pugh provided as to where certain assumptions came from.   (*Id.* at 29:7-30:5 (allowing testimony concerning "when [Mr. Pugh] thinks the plant will be operational" and stating that the testimony will be given "the weight that . . . it deserves"); *id*. at 38:1-4 (allowing testimony concerning conversation between Tonopah and NVE regarding the PPA); *id*. at 48:2-3 (overruling hearsay objection to email exchange between Tonopah's President, Chris LeWand, reflecting status of recent PPA negotiations with the NVE (A0936) ("PPA Email"))).

In addition to Mr. Pugh's testimony, Tonopah moved documentary exhibits into the evidentiary record, including a schedule detailing repairs to the Plant's hot salt tank (A0552) ("Repair Schedule") (*id.* at 40:3-43:3); the PPA Email (A0936) (*id.* at 43:13-48:5); a report titled "Commercial Value and Strategy" prepared by Energy GPS Consulting for Tonopah (A0534) ("EnergyGPS Report") (*id.* at 82:21-25); and the Beaulne Report (A0648) (*id.* at 8:15-23). Appellants presented expert testimony from their two expert witnesses, Dr. Schatzki and Mr. Jaskulski, including testimony by Mr. Jaskulski that he was "impressed by the quality" of the hot salt tank designs, the management of the Plant, and the Plant's reconstruction team, and that it was "more likely than not that the people working on the reconstruction efforts" at the Plant would

"get it right this time." (*Id.* at 126:15-127:5, 132:17-20).  Appellants also moved several exhibits into the evidentiary record. (*See id.* at 110:20-208:10).

Following various meet-and-confer sessions, the parties advised the court that the agreed-upon evidentiary record consisted of all of Appellants' exhibits and substantially all of Tonopah's exhibits, subject to the court's rulings on the Pugh Declaration. (*See* A1168 ("Exhibits Email"); 12/3/20 Tr. at 5:1-7).  The parties also agreed that the voluminous materials supporting the Schatzki and Jaskulski's expert reports were admitted by the court during the Confirmation Hearing. (*Id.*).

At the Bankruptcy Court's request, Tonopah, CMB, and SolarReserve participated in an informal mediation with Judge Shannon after concluding the first day of the Confirmation Hearing. (12/3/20 Tr. at 4:5-7, 14-19, 99:15-18).  As a result of that mediation, Tonopah and Cobra agreed to two enhancements to the Plan. (*Id.* at 6:18-25, 7:1-21, 93:9-15).  First, Cobra agreed to provide the $6 million CMB/SR Letter of Credit in favor of Appellants as a reserve to be drawn on in the event that they obtain a final, non-appealable judgment against Tonopah and Tonopah fails to pay that judgment. (*Id.* at 7:7-15).  Second, Cobra agreed to increase an initial total working capital facility of $50 million by $14 million ( "Working Capital Facility"). (*Id.* at 7:16-21).

## B.    Feasibility Finding

On December 3, 2020, the Bankruptcy Court concluded the Confirmation Hearing and ruled that the record supported a finding that the Plan was feasible, particularly in light of the CMB/SR Letter of Credit and the increased Working Capital Facility. (*Id.* at 6:18-25, 7:1-21, 93:9-15).  With respect to the Nevada Complaint, the court observed that the claims were "based on a lawsuit that's in its infancy and that will not be adjudicated for some time," that the "various Cobra defendants are likely to bear [the] weight of the damages sought if the suit is successful given CMB SolarReserve's own complaint admissions and theories," and that "the claims face intense opposition from the debtor, based on, from what I can tell, substantial defenses." (*Id.* at 96:9-17).

As a result, the court considered it "unreasonable for feasibility purposes to assume that CMB SolarReserve will ultimately have a $90 million . . . claim against the debtor's estate or anything close to that amount." (*Id.* at 96:18-21). The Bankruptcy Court further ruled that the Plan satisfied each of the Bankruptcy Code's other confirmation requirements. (*Id.* at 93:9-15).

### C.    Plan Feasibility Under § 1129(a)(11)

As noted, plan feasibility requires that "the Plan is workable and has a reasonable likelihood of success." *Drexel*, 138 B.R. at 762. A guarantee of success is not required. *Id.* "[Debtor] need[s] only to demonstrate a reasonable likelihood of success, not an absolute certainty." *W.R. Grace,* 729 F.3d at 349. As Debtor correctly notes, this is a low threshold. *See In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *15 (Bankr. D. Del. Dec. 5, 2019). "The mere potential for failure of the plan is insufficient to disprove feasibility." *In re Patrician St. Joseph Partners L.P.*, 169 B.R. 669, 674 (D. Ariz. 1994); *see also In re Drexel*, 138 B.R. at 763 ("[S]peculative prospects of failure cannot defeat feasibility."). To find that a debtor must go beyond showing that the plan has a "reasonable prospect of success" would impose "an extraordinary duty on the Debtor that is simply not mandated by the Code." *In re Wetdog, LLC*, 518 B.R. 126, 139 (Bankr. S.D. Ga. 2014) (financial projections showing that Debtor would have positive cash flow for the next few years unless the worst case scenario from Plan opponent's expert's report happened supported feasibility determination).

In evaluating feasibility, courts have identified the following probative factors: (i) the adequacy of the debtor's capital structure; (ii) the earning power of its business; (iii) economic conditions; (iv) the ability of the debtor's management; (v) the probability of the continuation of the same management; and (vi) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provision of the plan. *Emerge*, 2019 WL 7634308, at *15 (citations omitted).

As Debtor correctly points out, Appellants face a high hurdle to demonstrate that the Bankruptcy Court committed clear error when it determined that the Plan was feasible and entered the Confirmation Order – Appellants must demonstrate that the findings are "completely devoid of a credible evidentiary basis or bear[ ] no rational relationship to the supporting data." *Coastal Broad. Sys.*, 570 F. App'x. at 193; *see also Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996) ("Feasibility is a factual question subject to the clearly erroneous standard of review."). And in estimating the value of a pending civil litigation claim for the purpose of assessing feasibility, the bankruptcy court may determine the value of the claim "using whatever method is best suited to the particular contingencies at issue." *See Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).

### D.     Appellants Fail to Demonstrate Clear Error as to the Feasibility Finding

The Court agrees with Debtor that Appellants' arguments on appeal suffer from two overriding flaws: (1) a misunderstanding of the feasibility standard, and (2) a mischaracterization of the evidentiary record relied upon.

First, Appellants urge this Court to overturn the Bankruptcy Court's feasibility determination based on Tonopah's alleged failure to provide "any" credible or admissible evidence at the Confirmation Hearing that it can "deliver" on certain "promises" set out in the Plan; namely that: (a) Tonopah can repair the Plant; (b) the Plant will generate 400 GWh of electricity per year; (c) Tonopah will obtain an agreement to sell the energy for $70 per MWh; and (d) Tonopah can pay creditors and post-confirmation operational expenses. (D.I. 19 at 15). Based on this alleged failure, Appellants argue, Tonopah "did not establish it can do what it plans to do, in the time period allowed, on the terms set forth in the plan." (*Id.*) It is evident, however, that "[a]ppellants seek, in effect, a guarantee [of the Plan's success]. But that is not the standard. The Plan must offer only a reasonable prospect for success." *In re Dana Corp.*, 2008 WL 11404248, at *5 (S.D.N.Y. Sept. 30, 2008).

Appellants take their argument one step further, as Debtor points out, seeking a guarantee that Tonopah's financial projections will be accurate down to the gigawatt and dollar. (*See* D.I. 19 at 32-33 (questioning Tonopah's capacity to sell energy for $70 per MWh or generate 400 GWh of electricity per year)). This is also not the standard. The Bankruptcy Court was not obligated to make a feasibility determination based on a finding that Tonopah's Financial Projections would be accurate to the level of individual assumptions. The Bankruptcy Court was only required to determine that the Plan was "workable" and that it was "reasonably likely" that Tonopah would be able to fulfill its obligations under the Plan, meeting estimated costs of administration while maintaining sufficient liquidity and capital resources.

Second, Appellants argue that the Bankruptcy Court only relied on Mr. Pugh's testimony, declaration, and Financial Projections in making its feasibility determination, and that such evidence was inadmissible. (*See, e.g.,* D.I. 19 at 35). This argument reads out of the record significant evidence admitted by the Bankruptcy Court without objection from Appellants.

### 1. No Clear Error in Findings Supporting Feasibility

#### a. The Bankruptcy Court Correctly Determined Plan's Substantial Cushion Mitigated Liquidation Risk

Debtor asserts that the Plan provides for a substantial capital facility which alone is sufficient to support a finding of feasibility. (D.I. 20 at 20-21). The Plan establishes a working capital facility of $64 million which can be drawn from as needed to cover operating expenses and future repairs to the Plant, as well as the $6 million CMB/SR Letter of Credit backing final judgments against Tonopah in connection with the litigation claims. (Plan § 7.5; § 7.14). This, in addition to the projected $7.5 million of cash on hand, means the Plan provides $71.5 million of cushion to mitigate risk of liquidation following emergence. (Pugh. Decl. ¶ 41; 11/20/20 Tr. 78:8-11). Even assuming the Plant never becomes operable – taking into account either Tonopah's ($21.7 million) or

Appellants' estimation of operating costs ($22 million) – Tonopah can operate for approximately three years without generating any revenue.  (A0398; Schatzki Decl. at 8; 11/20/20 Tr. 179:16-19).  Appellants' expert agreed, testifying that the pre-enhanced $50 million working capital facility would cover the operating costs of the Plant for two years.  (*Id.* 178:21-179:14).

Based on the foregoing, the Bankruptcy Court properly consider this cushion in making its feasibility determination, ruling that the Plan is feasible, "especially in light of the enhancements recently proposed by the debtor that will inure to CMB SolarReserve's benefit, directly and indirectly; mainly, the $6 million dollar letter of credit for their benefit and the increase of the debtor's post-emergence working capital facility."  (12/3/20 Tr. at 93:09-15).  The court correctly concluded, in line with Appellants' own expert, that, with the increased Working Capital Facility, Tonopah will have sufficient liquidity to operate for approximately three years.  (*Id.* at 94:20-23).

On appeal, Appellants insist that the cushion cannot support a feasibility finding because Tonopah allegedly "failed to address [that] this amount would be insufficient if Appellants claims [in the Nevada litigation] are allowed."  (D.I. 19 at 34).  Appellants contend that "Debtor cannot argue that it will not need to reorganize or liquidate because it can use this amount to pay for operational expenses and at the same time argue that it has capital available to pay Appellants' claims if they are allowed."  (*Id.*).  As Debtor correctly argues, however, this type of speculative argument is precisely the type of argument that courts reject in making feasibility determinations.  *See In re Drexel*, 138 B.R. at 763.  Indeed, Appellants' position that the $71.5 million cushion (plus the $6 million CMB/SR Letter of Credit) will not be adequate contemplates an unlikely scenario whereby (a) the Plant never operates or generates revenue again, and (b) the Nevada Complaint survives dismissal and proceeds to litigation , and Tonopah is held liable for the full $90 million claim despite the fact that the majority of Appellants' claims target Cobra.  Courts do not make feasibility determinations based on this type of conjecture.  *See Dana Corp.*, 2008 WL 11404248 at

\*5.  By contrast, Tonopah's Working Capital Facility provides direct support for the court's finding that the Plan is feasible.  *See Emerge*, 2019 WL 7634308 at \*15 (holding plan feasible as "reorganized debtors will have approximately $50 million available under their exit facility to satisfy obligations as they come due.").

### b.     The Bankruptcy Court Properly Weighed the Likelihood that the Plant Would Become Operational and Profitable

The Bankruptcy Court found that "[g]iven the totality of the circumstances," Tonopah's assumption that it would repair the Plant and achieve successful operations in the near term as projected was not "fanci[ful] or even unlikely." (*Id.* at 95:13-16).   Debtor argues that ample evidence, including testimony from Appellants' own expert, supported Tonopah's assumptions, as reflected in the Financial Projections, that (i) the Plant's repairs will be successful; (ii) the Plant will generate enough energy to be profitable; and (iii) the Plant will sell energy at a profitable price point.

Regarding repairs, Appellants' expert Mr. Jaskulski testified that Tonopah's repairs to the Plant were likely to be successful. (*See id.* at 94:10-13; 11/20/20 Tr. at 132:17-20 (testifying that it was "more likely than not that the people working on the reconstruction efforts [of the Plant] get it right this time")).  Mr. Jaskulski further testified that he was impressed by the quality of the designs for the hot salt tank, the quality of the management of the work of Tonopah, and the designs prepared by an engineering consultant for the Project.  (*Id.* at 126:15-127:01). Mr. Jaskulski confirmed the "team involved in the reconstruction of the Tonopah Plant is giving it their best effort" and that there's a reasonable likelihood that the people involved in the redesign and reconstruction will learn from the past. (*Id.* at 127:02-05, 130:10-17).

Regarding energy generation, Tonopah's financial projections estimated that the Plant will generate 400 GWh in electricity beginning in 2021, increasing at one percent per year.  (A0398). Appellants argue that no credible evidence establishes that the Plant can generate this level of

electricity.  But Appellants' own experts supported Tonopah's assumption that the Plant, once repaired, would be capable of generating enough energy to be profitable.  Both of Appellants' experts agreed that the Plant has the ability to deliver over 500 GWh of electricity annually. (*See* Schatzki Decl. at 4; 11/20/20 Tr. at 125:03-06).  Moreover, the evidence also showed that the Plant would not have to generate 400 GWh of electricity annually to be profitable. Under Appellants' expert's "most likely" scenario for power generation, the Plant will generate between 352.5 to 368 GWh annually, a difference from Tonopah's own projections of only 13–14% per year. (*See* Jaskulski Decl. at 27).

Regarding pricing, Tonopah submitted evidence supporting its assumption that it can sell electricity at a price point which would render the Plant profitable, with a plan to sell electricity at $70 per MWh pursuant to a new PPA with NVE.  The Debtor introduced this plan through Mr. Pugh's testimony and the Beaulne Report.  (Pugh Decl. ¶ 39; 11/20/20 Tr. at 36:5-37; Beaulne Report at 42).  Mr. Beaulne reviewed the Financial Projections, found them to be reasonable, and further determined that $70 per MWh was not significantly different from the price Tonopah would receive if it did not have a PPA in place.  (Beaulne Report at 3, 43).  The Beaulne Report was admitted into evidence during the Confirmation Hearing without objection (11/20/20 Tr. at 8:15-12), and independently supports Tonopah's projected sale price of $70/MWh.  At this price point, even assuming the Plant only generates the low end of Appellants' expert's prediction for the Plant's power output (352.5 GWh annually), the Plant will generate over $2.7 million in excess cash a year.[4] Even without a PPA in place, other evidence supports a determination that Tonopah has other monetization streams available once the Plant is operating, including (1) dispatching energy into the

---

[4]   352.5 MWh x $70 = $24,675,000, minus $21,700,000 (operating expenses), minus Dr. Schatzki's figure for variable costs (352.5 MWh x $0.71/MWh = $250,275) = $2,747,725 per year.

wholesale market; (2) monetizing its capacity value; and (3) sale of renewable energy credits. (Pugh Decl. ¶ 39; Beaulne Report at 13; EnergyGPS Report at 1).

Appellants argue on appeal that there is "[n]o evidentiary support that Debtor can sell energy for $70.00 per MWh." (D.I. 19 at 29). But even assuming Appellants are correct, the Bankruptcy Court did not rely on Tonopah's projection of obtaining $70/MWh in making its feasibility determination. The Bankruptcy Court found that "CMB SolarReserve's own expert testified, and the evidence reflects . . . that the debtors could sell electricity for approximately $48 dollars per megawatt [hour]." (12/3/20 Tr. at 94:10-14). Even assuming that Tonopah can sell energy for only $48/MWh, the evidence supported a determination that it is reasonably likely that Tonopah will not face a future liquidation, especially given the Working Capital Facility.

> **c.    The Bankruptcy Court Properly Weighed the Likelihood of Appellants Obtaining A $90 Million Judgment In The Nevada Action**

The Bankruptcy Court determined that it is "unreasonable for feasibility purposes to assume that CMB [or] SolarReserve will ultimately have a $90 million claim against the debtor's estate or anything close to that amount." (12/3/20 Tr. at 96:18-21). Although the Bankruptcy Court acknowledged that Tonopah would not have sufficient funds to pay a $90 million judgment, it concluded that Tonopah's defenses were "substantial" and the claims were not worth $90 million or "anything close to that amount." (12/3/20 Tr. at 15-21). The court noted that Appellants' proofs of claim are contingent, unliquidated, and disputed, and based on a lawsuit in its infancy that will not be adjudicated for some time. (*Id.* at 96:01-11). "Moreover, the various Cobra defendants are likely to bear [the] weight of the damages sought if the suit is successful given CMB's own complaint admissions and theories. And the claims alleged face intense opposition from the debtor, based on from what I can tell, substantial defenses." (*Id.* at 97:12-17).

In estimating the value of Appellants' litigation claim for the purpose of assessing plan feasibility, the Bankruptcy Court is permitted to "us[e] whatever method is best suited to the particular contingencies at issue." *Bittner,* 691 F.2d at 135. Indeed, the court may estimate the value through a simple review of the pleadings and oral argument. *See In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994) (citations omitted). The Bankruptcy Court made its determination after receiving substantial motion to dismiss briefing from the parties concerning the claims alleged in the Nevada Complaint. The issue of the sufficiency of the Nevada Complaint was addressed in the Claim Objection and Confirmation Brief, and was also the subject of oral argument at the Confirmation Hearing. (12/3/20 Tr. at 37:04-46:24).

The record supports the Bankruptcy Court's conclusion. As of the date of the Confirmation Hearing, Tonopah had not even been served with the Nevada Complaint. (12/3/20 Tr. 45:06-11). The bulk of Appellants' claims do not relate to Tonopah, and those that do are derivative of more substantial claims against other defendants. (*See* A0446 (CMB proof of claim alleging that the Project was "plagued by repeated failures by [CPI]" and that "[t]he Project's failure is due almost entirely to [CPI]")). Appellants' $90 million contingent claim against Tonopah would need to not only survive a motion to dismiss, discovery, and a trial, but would need to be substantially apportioned to Tonopah, alleged as a mere aider and abettor – even though the complaint also alleges that "[t]he Project's failure is due almost entirely to [CPI]." (*Id.*). And in recognition of a more realistic assessment of the fair value of Appellants' litigation claims, following the mediation before Judge Shannon, Cobra agreed to post the $6 million CMB/SR Letter of Credit and increased the Working Capital Facility, as a backstop against a future judgment and damages award against Tonopah in the Nevada Action. The Court finds no clear error in the Bankruptcy Court's valuation of the litigation claims as substantially less than $90 million and its determination that the Plan's cushion, as supplemented by the backstop, presented a workable provision for payment of

27

Appellants' contingent litigation claims.  Appellants' apparent insistence that the Plan set aside $90 million for their claims is based upon speculation that Debtor will be found liable for the full $90 million and unable to pay the full amount.  Appellants' mere speculation of such an outcome is not enough to defeat confirmation on feasibility grounds because the mere "possibility of failure is not fatal to confirmation."  *In re W.R. Grace & Co.*, 475 B.R. 34, 120 (D. Del. 2012) (internal quotes omitted).

### 2.    No Abuse of Discretion in Evidentiary Rulings

#### a.    Mr. Pugh's Testimony Was Not Hearsay

A statement is hearsay if "(1) the declarant does not make [it] while testifying at the current trial or hearing; and (2) a party offers [it] in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  If a statement is offered in court for a purpose other than proving the truth of the matter asserted, then it is not hearsay.  *Anderson v. U.S.*, 417 U.S. 211, 219 (1974) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted.").  For example, if an out-of-court statement is offered to "provide context" for what a person knew, the statement is not hearsay.  *U.S. v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016).

Mr. Pugh served as the Treasurer of Tonopah since December 4, 2017.  (Pugh Decl. ¶ 1).  In that capacity, he became familiar with all aspects of Tonopah's operations, business affairs, and financial condition.  (*Id.* ¶¶ 1-6).  Mr. Pugh was responsible for supervising Tonopah's remediation and repair of the hot salt tank and returning the Plant to full operability.  In that role, Mr. Pugh supervised the team responsible for repairing the hot salt tank, spoke daily with the two FTI employees managing the hot salt tank repair process on the ground, and attended status calls every other week.  (11/20/20 Tr. 22:22-24:10).  In connection with the chapter 11 case, Mr. Pugh also prepared Tonopah's Financial Projections.  (*See* A0398; Pugh Declaration ¶ 37; 11/20/20 Tr. 30:8-

31:9).  In preparing the Financial Projections, which Tonopah submitted to the Bankruptcy Court, in part, to demonstrate that the Plan meets the feasibility requirement, Mr. Pugh analyzed Tonopah's operating expenses and projected costs.  (Pugh Decl. ¶ 37).  Mr. Pugh based his analyses on a set of assumptions rooted in his and management's experiences and historical trends and data, and "incorporated material considerations pertaining to the current industry environment, historical operating and production performance, [management's] knowledge and relationship with vendors and prospective customers, and [Tonopah's] operating costs." (*Id.* ¶ 37).  Appellants did not object to admitting the Financial Projections into evidence.

At the Confirmation Hearing, Mr. Pugh testified about his preparation of the Financial Projections, including the underlying assumptions and material considerations incorporated therein. (11/20/20 Tr. at 31:10-33:4, 35:23-37:1, 39:1-22, 40:3-41:3, 41:18-42:4, 43:13-46:8, 48:8-50:7). Among other things, Mr. Pugh testified concerning his assumptions regarding the date that repairs to the Plant were expected to be completed and Tonopah's ability to enter into a new PPA with favorable pricing.  (*Id.* at 36:5-37:1 (testifying concerning the Financial Projections' assumption of a PPA price of $70.00 MWh); *id.* at 40:17-41:3 (testifying concerning the Financial Projections' assumption concerning "when the plant could be recommissioned")).

Appellants objected to aspects of Mr. Pugh's testimony as hearsay throughout the Confirmation Hearing.  Debtor repeatedly explained that Mr. Pugh's testimony was not being offered to prove the truth of the matters asserted therein, but to explain and provide context for assumptions underlying the Financial Projections.  (*See id.* at 14:23-15:13 (explaining testimony concerning NVE's statements in PPA negotiations were "being offered to explain the assumptions that Mr. Pugh made in preparing his financial projections" and "not being offered for the truth of the matter asserted"); *id.* at 34:19-25 (explaining testimony concerning Plant's ability to generate 400 GWh and other operating history were "being offered to explain the basis for the assumptions

29

that Mr. Pugh made in preparing the financial projections" but not "for the truth of the matter asserted"); *id*. at 37:14-23 (explaining Mr. Pugh testified concerning PPA negotiations with NVE for a $70 per MWh pricing were being referenced "to explain the basis for the assumptions in his projections" rather than "for the truth of the matter asserted")).  The Bankruptcy Court permitted Mr. Pugh to testify for these non-hearsay purposes, agreeing that Tonopah could "put Mr. Pugh on the stand to explain what the numbers [in the Financial Projections] are and how he came up with the numbers and why I should find that those numbers are reliable."  (*Id.* at 35:23-36:2).

On appeal, Appellants challenge three categories of Mr. Pugh's testimony as hearsay: the Plant's operations, the PPA negotiations with NVA, and the timeline for Plant repairs.  With respect to the first two categories, the Court overruled Appellants' objections and determined that they went to the weight of the evidence, rather than its admissibility, and could therefore be explored on cross-examination – and they were explored extensively during the Confirmation Hearing.  (*See id.* at 34:4-6 (advising counsel for Appellants to probe the reliability of Mr. Pugh's testimony concerning the Plant's operations "on cross"); *id*. at 38:1-17 (advising counsel for Appellants to explore testimony concerning NVE PPA negotiations "on cross-examination"); *id*. at 38:14-17).  With respect to the third category – testimony concerning the expected completion of Plant repairs in February 2021 – the Bankruptcy Court permitted Tonopah to offer a business record concerning the planned repair and remediation of the hot salt tank.  (*See* A0552).  Mr. Pugh testified about the Repair Schedule for the purposes of explaining why he assumed that completion date in preparing the Financial Projections, not to prove that the repairs would be completed on time.  (11/20/20 Tr. at 40:17-25 ("[The Repair Schedule] was used when the projections were put together to develop a basis for when the plant could be recommissioned.")).

Appellants further argue on appeal that Cobra's Repair Schedule was improperly admitted as a business record because "it was not [Tonopah's] business record."  (D.I. 19 at 19).  Business

records of an activity a business regularly conducts can be an exception to the rule against hearsay. Fed. R. Evid. 803(6). A custodian or qualified witness must testify and lay a foundation about the records. *U.S. v. Console*, 13 F.3d 641, 656-57 (3d Cir. 1993). Appellants argue that the Third Circuit has held that a qualified witness "need not be an employee of the [record-keeping] entity so long as he understands the system." *Id.* at 657. "The witness need only have familiarity with the record-keeping system and the ability to attest to the foundational requirements of Rule 803(6)." *Id.* The foundational requirements are that: (1) the declarant in the records had knowledge to make accurate statements; (2) the declarant recorded statements contemporaneously with the actions which were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business. *Id.* Appellants assert that Mr. Pugh could not establish this foundation, as he is not familiar with Cobra's record-keeping system, and Debtor did not provide another qualified witness to lay the or offer other "indicia of trustworthiness" as described by the Third Circuit. *See id.* at 658.

Conversely, Debtor argues that courts permit litigants to introduce a third-party company's business records as their own under the business records exception where such records are sufficiently reliable, incorporated into the business's own records, and otherwise meet the requirements of Rule 803(6). *See Silver- Krieger, Ltd. v. Nicon Warehouse*, 1986 WL 4311, at *5 (D.N.J. Apr. 2, 1986) (admitting documents as business records where available witnesses could not "attest to the method of recordation utilized" by the producer of the records but had "integrated [the documents] into their internal records and . . . relied upon them in their day-to-day operations"); *see also Brawner v. Allstate Indemn. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) ("[T]he district court did not abuse its discretion by concluding that Allstate was not required to produce an individual from the entity that prepared the record to establish a foundation"). Here, Mr. Pugh, who was a corporate officer of Tonopah and intimately familiar with its recordkeeping practices, testified that he received

31

the Repair Schedule in the ordinary course of business, that versions of the Repair Schedule were regularly sent to members of the Tonopah team to provide updates concerning the hot salt tank repairs, and that he relied on the Repair Schedule as part of Tonopah's records.  (*See* 11/20/20 Tr. at 39:23-43:1).   Although other indicia of trustworthiness are clearly present here, Appellants' argument is well taken.  Even if admission of the Repair Schedule was error, however, the admission was harmless error for the reasons set forth below.

### b.     Mr. Pugh Offered Admissible Lay Opinion Testimony

During the Confirmation Hearing, Mr. Pugh's testimony concerning the status of the Plant's repairs, completion timeline, ability to operate at full capacity, and PPA negotiations with NVE was also admitted as lay opinion testimony.  A non-expert may offer lay opinion testimony whenever such testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  "The modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination."  *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980).

In the Third Circuit, it is well established that a person who is intimately familiar with the day-to-day business affairs of a company may offer a lay opinion concerning those affairs.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (finding "knowledge and participation in the day-to-day affairs" of a business supports admission of lay opinion testimony).  Such opinions may rely on information and documents prepared by others without falling outside the permissible scope of a lay opinion.  *Id.*  Moreover, a "witness testifying about business operations may testify about 'inferences that he could draw from his perception' of a business's records, or 'facts or data perceived' by him in his corporate capacity."  *United States v. Polishan*,

336 F.3d 234, 242 (3d Cir. 2003); *see also Regscan, Inc. v. Brewer*, 2007 WL 879420, at *6 (E.D. Pa. Mar. 16, 2007) (finding senior employee "with knowledge of the day-to-day operations of the business, was entitled to rely on the work of the individuals who searched . . . databases as well as his own experience" to provide admissible lay opinion).

As Tonopah's long-time Treasurer who was intimately familiar with all aspects of Tonopah's operations, business affairs, and financial condition, Mr. Pugh's testimony concerning the core assumptions underlying the Financial Projections qualifies as an admissible lay opinion under Rule 701. Even if Mr. Pugh's testimony concerned a "specialized" field and "involved predictions about future business performance," he had more than adequate personal knowledge to offer opinions about Tonopah's future financial condition and business plans "in light of his in-depth experience with the business's contracts, operating costs, and competition." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).

Appellants argue Mr. Pugh's testimony should have been excluded because he was not qualified as an expert witness but nevertheless testified about technical topics concerning the Plant's operations and ability to generate 400 GWh, the repair and remediation of the hot salt tank, and market rates for electricity. (D.I. 19 at 12). As Debtor correctly argues, Mr. Pugh need not be an expert witness to testify about the Plant's operations, particularly given his senior role with Tonopah and extensive knowledge of Tonopah's business operations. In *Joy Mfg. Co. v. Sola Basic Indus., Inc.*, for example, the Third Circuit considered whether a manufacturing plant operator could offer a lay opinion on damages that required knowledge concerning a wide range of topics, including furnace operations, contract negotiations, and pricing. 697 F.2d 104 (3d Cir. 1982). The Third Circuit held he had sufficient personal knowledge of the plant's operations to offer such an opinion. *Id.* at 112. To the extent the plant manager was unable to testify about specifics, the court observed that such issues were a proper subject of cross-examination. *Id.* & n.25. Mr. Pugh has a similar

degree of personal knowledge concerning the Plant.  As such, the Bankruptcy Court did not abuse its discretion by allowing his testimony concerning operational matters, such as his assumptions concerning the hot salt tank completion date, the Plant's operability by February 2021, and the Plant's ability to generate 400 GWh.

With respect to Appellants' argument that Mr. Pugh's testimony concerning the PPA negotiations with NVE was hearsay, the Third Circuit permits a corporate employee who is knowledgeable of the company's business affairs to offer lay opinions concerning "facts or data perceived by him in his corporate capacity." *Teen-Ed*, 620 F.2d at 403.  Courts within the Third Circuit have permitted non-expert witnesses to offer lay opinion testimony concerning agreements negotiated between third parties on the basis of facts learned through separate conversations with those third parties.  *See Starland v. Fusari,* 2015 WL 5771617, at *11 (D.N.J. Sept. 3, 2015) (permitting music artist to offer lay opinion on agent's and producer's agreement to share 50/50 in profits arising from music artist's success).  Mr. Pugh's testimony concerning his assumption that Tonopah would be able to sell electricity at $70.00 per MWh was an admissible lay opinion.

### c.  Admitting Mr. Pugh's Testimony Was, At Worst, Harmless Error

Even if the court abused its discretion by permitting Mr. Pugh to testify concerning the Plant's operations, the Repair Schedule, and PPA negotiations with NVE, or by admitting the Repair Schedule, those evidentiary rulings will not be reversed because they were harmless error.  *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  This rule applies equally in bankruptcy cases.  *See* Fed. R. Bankr. P. 9005; *Trans World*, 1996 WL 756962, at *6 (allowance of certain witness testimony and exhibits not prejudicial).

In finding that the Plan is feasible under the Bankruptcy Code, the Bankruptcy Court acknowledged that the "many assumptions built in the debtor's projections," including assumptions concerning "the timing to successfully completing the repairs, the quantity of production, and the anticipated selling price of the electricity," "might not ultimately prove correct." (12/3/20 Tr. 94:15-19). The Bankruptcy Court nevertheless found that the Plan was feasible because, among other things, the Working Capital Facility would enable Tonopah to operate for at least three years even "if operations never resume and no revenue is generated," DOE and Cobra were supporting Tonopah's post-emergence business, and "various Cobra defendants" would likely bear the "weight of the damages sought" if the Nevada Action were to be successful. (*Id.* at 94:20-98:20).

As to Appellants, the question for determining feasibility was "whether sufficient funds are available or will be available to CMB [and] SolarReserve if it should prevail against the debtor in its Nevada State Court lawsuit." (*Id.* at 95:16-20). Because the answer to that question would be "yes," even if all of Mr. Pugh's testimony concerning Plant operations, the Repair Schedule, and PPA negotiations had been excluded, any error in admitting such testimony was harmless. *See Phoenix v. Coatesville Area Sch. Dist.*, 683 F. App'x 117, 121 (3d Cir. 2017) ("permitting hearsay and speculative testimony" from appellee's sole witness was harmless error where appellee introduced "substantial amount of other evidence" to support outcome); *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 196 (3d Cir. 2016) (evidentiary error is harmless when litigant could "prove the elements of its case without reliance on the tainted evidence").

In sum, the Court finds no clear error in the determination that Tonopah, through the testimony of Tonopah's own witness, the Beaulne Report, cross-examination of Appellants' witnesses, the Working Capital Facility, the CMB/SR Letter of Credit, the Bankruptcy Court's assessment of Appellants' claims in the Nevada Complaint, and other business records, met the "low threshold" necessary to support a feasibility finding. *See Emerge*, 2019 WL 7634308, at *15.

## VI.    <u>MOTION TO DISMISS APPEAL AS EQUITABLY MOOT</u>

In light of the Court's determination to affirm the Confirmation Order, the Court need not address Debtor's Motion to Dismiss.  The Motion to Dismiss is therefore denied as moot.

## VII.    <u>CONCLUSION</u>

For the reasons set forth herein, the Motion to Strike is Granted, the Confirmation Order is affirmed, and the Motion to Dismiss is denied as moot.  An appropriate order will be entered.